COX WOOTTON LERNER
GRIFFIN & HANSEN LLP
Galin G. Luk (SBN 199728)
Thomas M. Fedeli (SBN 314647)
900 Front Street, Suite 350
San Francisco, CA 94111
Tel: (415) 438-4600
Fax: (415) 438-4601
gluk@cwlfirm.com
tfedeli@cwlfirm.com

Attorneys for Co-Applicant
YANG MING MARINE TRANSPORT CORP.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Application of<br>YANG MING MARINE TRANSPORT CORPORATION<br><br>Applicant,<br><br>For Order Authorizing Discovery Pursuant to FRCP RULE 27 And/Or For Use In Foreign Proceedings Under 28 U.S.C. § 1782 | Case No.: 8:21-mc-00016<br><br>**DECLARATION OF ZEB YANG** |

I, Zeb Yang, upon information and belief, declare under penalty of perjury under the laws of the United States and the State of California as follows:

1. I am a member of the Cargo Claim Team, Risk Management & Insurance Claim Department, Yang Ming Marine Transport Corp. ("YM") and have been so employed for 17 years. In that capacity I am regularly involved in assisting in YM's investigation of losses and casualties involving cargo for which YM has issued bills of lading or otherwise agreed to act as an ocean transportation carrier and have been so involved in the instant matter.

2. YM, a corporation organized and existing under the laws of Taiwan (R.O.C.) ("Taiwan"), has issued ocean bills of lading which contain a US Federal District Court for the Southern District of New York ("SDNY") exclusive jurisdiction clause to hundreds of cargo interests

of relevance to this application. One example of such bill of lading terms is attached. (**Exhibit 1YM**). Furthermore, pursuant to the YM bill of lading terms, any shipper or consignee holding such a bill of lading has contractually agreed it may only sue YM and not, for example, Ocean Network Express Pte. Ltd ("ONE") or the Vessel Owner, greatly increasing the likelihood of such suits against YM. Accordingly, in the near future YM reasonably anticipates litigation will be brought against it in the SDNY by various cargo interests alleging cargo damage under YM issued ocean bills of lading. Indeed, YM has already received claim notices in excess of $3,000,000 (three million dollars) from various cargo interests. (**Exhibit 2YM**). YM reasonably expects to name ONE as a third party defendant pursuant to Federal Rule of Civil Procedure, Rule 14 (c) making ONE an adversary to YM and to third party cargo claimants directly.

   3. Additionally, YM reasonably contemplates bringing an arbitration (the "London Arbitration") in the near future against ONE, a corporation with joint headquarters in Singapore and Japan, before the London Maritime Arbitrators Association ("LMAA") tribunal (the "LMAA Tribunal"). YM has a slot-charter or Vessel Sharing Agreement, as discussed below at paragraph 6, with ONE that provides for such London Arbitration of disputes such as YM now has with ONE.

   4. I submit this Declaration in support of YM's Application for an *Ex Parte* Order Pursuant to 28 U.S.C. § 1782 to Obtain Discovery for Use in a Foreign Proceeding. Additionally, relief is sought pursuant to Federal Rules of Civil Procedure, ("FRCP") Rule 27 seeking to perpetuate testimony and evidence for use in the SDNY anticipated litigation. (Together the "Application/Petition"). I make this Declaration based on my own personal knowledge and on documents that I have reviewed.

**BACKGROUND OF THE PARTIES' DISPUTE**

   5. The dispute underlying the prospective London Arbitration and litigation in the SDNY, concerns the collapse of and subsequent loss overboard of approximately 843 ocean freight containers loaded with cargo belonging to third-parties carried on deck on the container ship ONE APUS ("Vessel"). The collapse of stow also damaged many hundreds more of containers which

2

remained on deck, albeit in a disarrayed fashion. Together the two groups of damaged or lost containers are referred to as The Containers. ("The Containers")

6. Yang Ming slot-chartered space aboard the ONE APUS, for several thousand containers. A slot charter is a contractual arrangement whereby one carrier is able to book containerized cargo on another carrier's vessel. Here the subject slot charter agreements is titled THE Alliance Operating Agreement and is mutual, allowing contracting parties to book cargo on each other's ships. (**Exhibit 3YM**)

7. The ONE APUS is a large container ship built in 2019. It is 146,694 gross registered tons, with deadweight tonnage of 138,611 (the weight of its cargo), and with a capacity for carrying up to 14,052 twenty-foot ocean freight containers. The ship is registered in Japan, and is: (a) owned by Chidori; (b) bareboat chartered to Jessica, a company registered in Panama; (c) time chartered to NYK (who also act as the Vessel's managers); and (d) sub-chartered to ONE who acts as the "Ship Operator" for the purpose of the THE Alliance Operating Agreement between (i) HMM Company Ltd.; (ii) Hapag-Lloyd Aktiengesellschaft; (iii) Ocean Network Express Pte. Ltd.; and (iv) Yang Ming Marine Transport Corp., Yang Ming (UK) Ltd and Yang Ming (Singapore) Pte. Ltd.

8. The collapse and loss of The Containers occurred on November 30, 2020 while the ship was in transit from Yantian, China, to the Port of Long Beach, California ("Voyage"). It appears some 207 YM containers were lost and an unknown number of other YM containers damaged as a result of that casualty.

9. ONE, as the operator and the Head Charterer of the ONE APUS, was responsible, individually and through its subcontractors, to YM for the safe and proper stowage of The Containers on the Vessel and for ensuring that The Containers carried onboard arrived at their ports of discharge intact. However, during the subject Voyage, tens of millions of dollars' worth of cargo carried in The Containers, as well as the valuable containers themselves, were lost overboard, and many more millions of dollars' worth of on-deck cargo and containers were damaged in the collapse. The current estimate of the total loss is significant and certainly in the tens of millions of dollars.

10. As soon as reasonably practicable YM, potentially along with other charterer claimants impacted by the loss of and damage to The Containers and their contents, will commence an

arbitration against ONE before an LMAA Tribunal seeking compensation for all damages suffered by it. .

11. Additionally, as YM faces multiple claimants asserting damages for cargo losses under YM ocean bills of lading issued for cargo carried aboard the Vessel on the Voyage, it reasonably anticipates millions of dollars' worth of cargo claims will be brought against it shortly in the SDNY. As, based on experience and advice of counsel, the subject bills of lading are controlled by a one year statute of limitations, such suits are reasonably anticipated in the near term.

## 28 USC § 1782 APPLICATION

12. I have reviewed the discovery that YM seeks through its 28 USC § 1782 Application. Specifically, YM is requesting that ONE, as well as the Vessel Owner, Chidori Ship Holding LLC ("Chidori"), the Bareboat Charterer, Jessica Ship Holding S. A. and the Vessel Manager NYK Shipmanagement Pte. Ltd. produce documents including, but not limited to: (1) details of the arrangement plan, mid-ship section, and container capacity plan; (2) the cargo securing manual relied upon by ONE and its subcontractors in securing The Containers; (3) details of the sailing condition of the ONE APUS from the port of Yantian; (4) photographs and/or video footage taken prior to, during, and/or after the incident; (5) an overview of lost and/or damaged shipping containers, including the container numbers, weights, contents, and positions; (6) the container stowage and lashing plan; (7) Voyage Data Recorder ("VDR") backup for the 12 hours prior to and including the incident; and (8) a full, three day inspection of the ONE APUS in the Port of Long Beach by two qualified surveyors/experts, limited to the cargo area, bridge area and engine room, if said areas are considered relevant by said surveyors/experts. Additionally, attached as **Exhibit 4YM** is a specific list of the documentation/materials/information which YM seeks from ONE, as well as from the Vessel Owner, the Bareboat Charterer, and from the Vessel Manager, subject to revision, as considered necessary based upon the surveyors/experts examination once aboard.

13. I believe that the discovery YM seeks will materially assist the LMAA Tribunal in adjudicating the dispute between the parties. The discovery YM seeks is relevant to the questions of: (i) ONE's and/or its subcontractor's actions with regard to the stowage and securing of The Containers, the condition and the navigation of the Vessel and voyage conditions encountered on the

Voyage, culminating in the loss and damage of The Containers and cargo on November 30, 2020; (ii) the amount of damages YM suffered or will suffer as a result of such actions and events; and (iii) the full extent of the damage to The Containers and the cargo impacted by the collapse of The Containers, but not lost overboard.

14. YM has previously asked ONE to disclose the information sought through this Application, but despite repeated efforts ONE has not provided the requested information. Over the course of the past three months, while the Vessel was safely in Japan discharging damaged containers and otherwise addressing the casualty, ONE failed to allow interviews of persons with relevant knowledge, and refused to allow reasonable access to the ONE APUS itself. ONE permitted YM's surveyor a single, four hour survey aboard the ONE APUS in December 2020. **(Exhibit 5YM).** Obviously, that survey was not sufficient to gather all of the necessary information concerning what may be the world's largest container stowage collapse. The Vessel no doubt underwent many changes to itself and its securing equipment, all of which occurred with YM having no meaningful access to what those changes entailed or to any of the evidence that was undoubtedly irretrievably altered or lost. Since that time, YM has asked ONE and Chidori, the Head Owners of the ONE APUS for a reasonable inspection of the ONE APUS, which according to YM's experts would take about three days to complete. ONE has consistently denied or not responded to those requests.

15. YM has, on a number of occasions, requested documentation from ONE and Chidori considered crucial to understanding the casualty and damages YM has suffered, which requests have consistently not been complied with, in many cases with YM receiving no response whatsoever. Attached is one such example, with YM seeking documentation which remains unanswered, although now many months old. **(Exhibit 6YM).** Despite good-faith efforts by YM to obtain reasonable information in order to properly evaluate the damage to their containers and cargo carried therein, ONE and Chidori have not provided any documents in response to these requests, aside from a list of containers discharged in Japan, which is hardly the full information requested.

16. The more time that passes between the date of the incident and the eventual turnover of the needed information and the inspection of the ONE APUS, the more the quality of the needed information deteriorates. ONE is presently working to return the ONE APUS into service, but

5

where that will take the Vessel is unknown, although reputable information indicates it may return to Japan and then proceed to South China. The Vessel's present voyage only seeks to deliver containers remaining on-board, both on and under-deck, after the casualty. Once that is done the Vessel will undergo further repairs with more vital evidence being lost to YM. Likewise, other vessel equipment, information and documents is likely to be lost or altered. Compounding this issue, YM was prevented from attending on board the ONE APUS prior to the commencement of the repair work, and has thus far been prevented from witnessing the repair work to assess the extent of the damage. To the extent that the ONE APUS's continued service will erode the quality of the evidence, time is of the essence to secure a meaningful inspection of the vessel. Further, exacerbating the problem is the fact that ONE has yet to identify what repairs have already taken place, limiting YM's ability to evaluate the evidence once it eventually becomes available.

17. Furthermore, the more time between the incident and any interviews or depositions of vessel personnel, the greater the chance that important details will be forgotten, and the less likely it is that the same crew manning the ONE APUS would be the crew present for the incident. The time sensitive nature of the evidence sought by YM reinforces the need for this *Ex Parte* application. Additionally, without the documents/information sought through this application/petition, YM may lack the necessary evidence required in order to meet the pleading standards required for LMAA arbitration proceedings. Moreover, without an order granting this application/petition, YM will be forced to endure additional delays in obtaining evidence which will only prejudice its case in the contemplated London Arbitration.

### AUTHORITY OF THE LMAA AND RECEPTIVITY OF THE LMAA TO EVIDENCE PROCURED THROUGH U.S. ASSISTANCE

18. I have reviewed the Declaration of, Andrew Rigden Green a qualified English solicitor of the Senior Courts of England & Wales and submitted to this Honorable court in support of the application/petition of YM. I rely on what is offered by Declarant Green on the issues of the authority of the LMAA and receptivity of the LMAA to evidence procured through U.S. assistance.

### PETITION FOR PRESERVATION OF TESTIMONY
### PURSUANT TO FRCP RULE 27

19. I am advised by United States counsel that pursuant to FRCP Rule 27 discovery may be obtained in order to preserve testimony of witnesses when litigation is reasonably anticipated by a petitioner who "expects to be a party to an action cognizable in a United States court, but cannot presently bring it or cause it to be brought." FRCP 27(a) (1) (A). As stated above, in paragraph 2, YM is subject to suit in the US District Court for the SDNY on all bills of lading issued by it for allegedly lost or damaged cargo carried aboard the subject Vessel on the concerned Voyage. **(Exhibit 1YM).** YM is not in a position to commence SDNY litigation on said claims, rather it must await the commencement of litigation against it. YM has already received claims for over $3,000,000 (three million dollars) and reasonably anticipates many more claims. **(Exhibit 2YM)** It expects many law suits or litigation following such claims or in some instances law suits without claims first being file. As a result, YM reasonably anticipates numerous law suits will be brought by parties with an interest in said cargo against it in the SDNY seeking monetary compensation for alleged cargo losses and damages. I am advised by US counsel that YM will seek to implead ONE into such actions.

20. Moreover, under the contractual relationship YM has for use of space aboard the ONE APUS on the Voyage, ONE has asserted that YM must defend all claims asserted by third-party cargo interests on any bill of lading issued by YM, even when cargo interests have determined ONE is the responsible party for the loss. **Exhibit 7YM,** attached hereto demonstrates that ONE is rejecting claims made against it and asking cargo interests to pursue such claim directly against YM as the bill of lading issuer.

21. YM seeks to depose the Master and Chief Mate of the Vessel in order to preserve evidence concerning the collapse of on-deck stowed containers. For example, it seeks to preserve evidence that necessarily exists on what repairs have taken place, what damaged cargo and containers remain on board, the extent of damage to same, what lashing and securing gear has been replaced and what securing equipment was on board at the time of the casualty and today, the cause of the casualty, information and computer programs concerning the stability of the vessel and its cargo stow, the information the Vessel received on weather, weather routing and other meteorological

events on the Voyage, records of the course of the Vessel, stowage plans and stowage manuals used on the loading of the cargo and Voyage. All that evidence exists as a matter of normal vessel operations and YM wants to see it preserved through testimony and copying. As already noted the passage of time will only complicate the obtaining of the evidence sought by YM. YM is interested in preserving such evidence in order to protect itself in litigation anticipated to be brought against it in the SDNY.

22. YM expects persons holding an interest in damaged or missing cargo carried under YM bills of lading to be adverse parties in the anticipated SDNY litigation. Additionally, on advice of counsel, ONE is expected to be an adverse party under a third-party complaint brought by YM pursuant to Federal Rule of Civil Procedure, Rule 14 (c).

23. YM seeks to depose the Master and Chief Mate of the Vessel. They are considered the most likely Vessel personnel to have knowledge about the evidence discussed above. Even if the those officers were not serving on the Voyage they will certainly have much relevant knowledge about the evidence referenced above and promise to be the most knowledgeable sources of said evidence of all witnesses likely to be available to YM. Even if later other knowledgeable witnesses should be available to YM there will be a natural and unavoidable deterioration in memories and evidence as time passes. YM needs the evidence sought now before it erodes further in order to prepare for and defend SDNY litigation. Although the Vessel is now in US waters, it is due to sail from those waters shortly, and it may never return or only after all contemplated litigation is concluded. The Master and Chief Mate now on board may also never again be subject to US jurisdiction. The opportunity to preserve the sought evidence may never exist again. For all these reasons, I believe the present circumstances constitute extraordinary circumstances warranting the relief requested.

24. The names and addresses of the officers now serving as Master and Chief Mate are unknown to YM. However, they are expected to be on-board the Vessel during its presence within the jurisdiction of this Honorable Court.

25. YM expects the two witnesses sought to be deposed to testify concerning the areas of inquiry set forth above. As likely highly experienced Ship's Officers the information sought is

well within the common knowledge of such vessel officers. Much of it concerns procedures on board and vessel equipment/documentation presently aboard.

26. I am further advised by counsel the often Rule 27 testimony is coupled to document discovery, especially where extraordinary circumstance are present, so that the testimony taken may be more meaningful and understandable. Accordingly, I respectfully request the evidence sought in the way of documents and things requested in **Exhibit 4YM** and otherwise referred to in paragraph 12 above be provided to YM for copying/inspection so that the opportunity to question the Master and Chief Mate may be as useful and efficient as possible and such physical evidence may be preserved. That is particularly important in this matter as it is considered unlikely that the Vessel, once its present cargo is discharged, will return to the jurisdiction of the US courts anytime in the foreseeable future. Similarly, it is very possible more knowledgeable Vessel personnel may never be available to YM for depositions or other testimony under oath.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 31 day of March, 2021 at Keelung, Taiwan.

_____
ZEB YANG